**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

NORTHWESTERN SELECTA, INC.,

    **Plaintiff,**

          **v.**                     **Civil No.** 20-1745 (FAB)

GUARDIAN   INSURANCE   COMPANY,
INC.,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court is defendant Guardian Insurance Company, Inc. ("Guardian")'s motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (Docket No. 13)  For the reasons set forth below, Guardian's motion is **GRANTED.**

**I.   Background**

This litigation concerns an alleged breach of an insurance contract.   Plaintiff Northwestern Selecta, Inc. ("Northwestern Selecta") invokes the Court's admiralty jurisdiction for its claims.   (Docket No. 1 at pp. 1—2)

The Court construes the following facts from the complaint, the "Marine Cargo Stock Throughput Policy," and Executive Order 2020-023 "in the light most favorable to the plaintiffs" and "resolve[s] any ambiguities" in the plaintiffs' favor.  See Ocasio-

Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011) (discussing the Rule 12(b)(6) standard of review).

### 1.   The Business

Northwestern Selecta is a Puerto Rico importer and distributer of frozen and refrigerated foods. (Docket No. 1 at p. 2)  The foods include "frozen cooked and sliced tentacles of giant squid/octopus" ("the seafood product") which arrive by ship from all over the world.  Id.

### 2.   The Insurance

Guardian is an insurance company organized pursuant to the laws of the U.S. Virgin Islands.  Id. at p. 1.

On February 6, 2020, Guardian insured Northwestern Selecta's seafood product with a "Marine Cargo Stock Throughput Policy," #STP001-2020 ("the policy").  (Docket No. 13-1 at p. 3; Docket No. 1 at p. 3)

The policy is an all-risk policy effective from March 1, 2020 to March 1, 2021, and the subject matter insured is "principally, but not limited to, Seafood and Meat of every description." (Docket No. 13-1 at p. 1)

The policy provides that the insurance attaches "from the time the subject-matter becomes the Insured's risk . . . whilst held as stock and/or inventory and until the Insured's risk and/or interest finally ceases."  (Docket No. 1 at p. 3)

The policy includes a specific "CIVIL AUTHORITY" clause, which states that:

> The subject-matter insured is covered against the risk of damage or destruction by civil or military authority for the purposes of preventing further damage or to prevent or mitigate a conflagration, pollution hazard or threat thereof provided that such damage or destruction is not caused or contributed to by war, invasion, revolution, rebellion, insurrection or other hostilities or war like operations or by any risk specifically excluded in this insurance.

Id. at p. 4.

### 3.   The Loss

At some point prior to March 15, 2020, Northwestern Selecta imported more than one million dollars' worth of seafood product and properly stored it.  Id. at p. 2.  Northwestern Selecta stores its food product in warehouses until it can sell the inventory to its customers, most of whom are food service entities. Id. at p. 3.

Due to the global health crisis caused by COVID-19, on March 15, 2020, the Governor of the Commonwealth of Puerto Rico issued Executive Order 2020-023 ("the lockdown order"), mandating stay-at-home requirements and generally prohibiting "commercial operations."  Id. at p. 4.  The lockdown order did not, however, apply to "food retail or wholesale businesses providing services through drive-thru, carry-out, or delivery only, including

prepared foods . . . or other businesses related to the food . .
. supply chains."  (Docket No. 13-2 at p. 3)

As of March 15, 2020, Northwestern Selecta had about
10,936 boxes of insured seafood product in its warehouse that it
estimates was worth $552,851.50.[1]  (Docket No. 1 at p. 4—5)

According to Northwestern Selecta, the lockdown order,
and subsequently issued similar orders, forced Northwestern
Selecta's customers, such as restaurants, cafeterias, and other
food service businesses, to suspend their purchases because those
businesses were required to close or severely limit their
operations.  Id. at p. 5.  The seafood product eventually expired
its shelf life and lost any commercial value.  Id.

Northwestern Selecta sought coverage for its loss from
Guardian.  Id.  On July 6, 2020, the adjuster for Guardian issued
a report stating that the loss was not caused by civil authority
and therefore not covered.[2]  Id.

The lead reinsurer also reviewed the claim pursuant to
the reinsurance policy and determined on October 8, 2020 that the

---

[1] Paragraph 22 of the complaint states that the seafood product was worth "five
hundred fifty two thousand eight hundred and fifty one dollars and fifteen cents
($552,861.50)" which the Court construes as $552,851.50.

[2] Paragraph 27 of Northwestern Selecta's complaint states that "[t]he adjusting
company did not issue a full and final report on loss analysis because it
considered that the loss was not caused by the civil authority coverage clause,"
which the Court construes to mean that the loss was not *covered* by the civil
authority coverage clause on causal grounds.

civil authority coverage did not apply because the food product was not physically damaged or destroyed by the government authority. <u>Id.</u> at p. 5—6. Moreover, the lead reinsurer concluded that the claim was precluded by an exclusion clause for loss, damage or expenses caused by delay. <u>Id.</u>

On October 8, 2020, Guardian notified Northwestern Selecta directly that its claim was denied based on the reinsurer's evaluation. <u>Id.</u> at p. 6.

Northwestern Selecta commenced this litigation on December 24, 2020 asserting breach of contract and requesting a declaratory judgment that the policy covers its losses.

## II. Defendant's Motion to Dismiss

### A.   Legal Standard

Rule 12(b)(6) permits a defendant to move to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Ocasio</u>, 640 F.3d

at 12.  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [a court] to draw on [its] judicial experience and common sense."  <u>Zenón v. Guzmán</u>, 924 F.3d 611, 616 (1st Cir. 2019) (internal quotation marks omitted). Additionally, "[w]hen . . . a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." <u>Beddall v. State St. Bank & Tr. Co.</u>, 137 F.3d 12, 17 (1st Cir. 1998).

**B.  Analysis**

Guardian argues that Northwestern Selecta's complaint fails to state a claim upon which relief can be granted for three reasons.  First, it alleges that the plain language of the policy does not provide coverage for the loss.  (Docket No. 13 at pp. 1-2) Second, even if there has been a loss pursuant to the terms of the policy, it was not proximately caused by the civil authority.  <u>Id.</u> Third, even if the civil authority proximately caused damage to the goods, the policy excludes the type of damage at issue, *i.e.* the expiration of the perishable good's natural life due to delay. <u>Id.</u>

> 1.   **Which Law Governs**

Because this case pertains to a marine insurance
policy, it arises pursuant to this Court's admiralty jurisdiction.
Com. Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006).
"When a contract is a maritime one, and the dispute is not
inherently local, federal law controls the contract
interpretation." Norfolk Southern Railway Co. v. Kirby, 543 U.S.
14, 22-23 (2004).

But, "[a]s a general rule, in the absence of
established and governing federal admiralty law, the states have
largely unfettered power to regulate matters related to marine
insurance." Catlin at Lloyd's v. San Juan Towing & Marine, 778
F.3d 69, 76 (1st Cir. 2015) (citing Wilburn Boat Co. v. Fireman's
Fund Ins. Co., 348 U.S. 310, 321 (1955)). The First Circuit Court
of Appeals has called this "the Wilburn Boat inquiry." Windsor
Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir.
1995).

The Wilburn Boat inquiry runs aground, however,
when it tries to apply Puerto Rico law to marine insurance
contracts. See Lloyd's of London v. Pagán-Sánchez, 539 F.3d 19,
25 (1st Cir. 2008) (analyzing whether Puerto Rico has stated a
different rule than the well-established admiralty rule, and
finding that "the Puerto Rico legislature has expressed its intent

to exclude maritime insurance contracts from its statutory provisions governing the interpretation and construction of insurance contracts.") Because the Puerto Rico legislature excludes marine insurance contracts from the Insurance Code, the First Circuit Court of Appeals has held that the Code is inapposite when interpreting marine insurance contracts in admiralty. Id.; see also Catlin at Lloyd's, 778 F.3d at 76—77 (refusing to look to the Puerto Rico Insurance Code because marine insurance is exempted from the application of the Insurance Code. P.R. Laws Ann. tit. 26, section 1101(1)).

The parties have nevertheless contracted to apply Puerto Rico law to the insurance contract. (Docket No. 13-1 at p. 2) Guardian contends that the riders following the contract of insurance, the Institute Cargo Clauses, are governed by English law. (Docket No. 13 at p. 4) Neither side has pointed to binding admiralty precedent nor Puerto Rico case law that would control the outcome of this case. Cf. F.C. Bloxom Co. v. Fireman's Fund Ins. Co., No. 10-1603, 2012 WL 13019207, at *2 (W.D. Wash. Jan. 23, 2012) (applying Washington law to a maritime dispute when the parties did not contest the choice of law issue and the court was not "aware of [a] difference between Washington law and maritime law that would make a material difference in this case"). In fact,

the Court is unaware, and the parties do not cite, cases that
interpret language similar to the provision in this action.

Pursuant to federal law, general principles of
contract law are used to interpret marine insurance policies.
Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004).
"Therefore, we turn to principles of general maritime contract law
to determine whether the contract . . . [is] ambiguous." Fed.
Marine Terminals, Inc. v. Worcester Peat Co., 262 F.3d 22, 26 (1st
Cir. 2001).

"The starting point in interpreting an insurance
policy is to determine whether the policy terms are ambiguous. As
a general rule, plain or unambiguous language will be given its
ordinary meaning and effect, and the need to resort to rules of
construction arises only when an ambiguity exists." Ingersoll
Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir. 1987).
"Where . . . the words of an insurance policy are plain, we will
'refrain from conjuring up ambiguities' and likewise 'abjure
unnecessary mental gymnastics which give the terms of the policy
a forced or distorted construction.'" Burnham v. Guardian Life
Ins. Co., 873 F.2d 486, 490—91 (1st Cir. 1989) (quoting Taylor v.
Aetna Cas. & Surety Co., 867 F.2d 705, 706 (1st Cir. 1989)). A
court should "[g]iv[e] the straightforward language . . . its
natural meaning." Perry v. New England Bus. Serv., Inc., 347 F.3d

343, 346 (1st Cir. 2003). "If an insurance contract is ambiguous it will generally be construed against the insurer who drafted it in order to promote coverage for losses to which the policy relates . . . . This principle applies to all types of insurance policies including maritime policies." Ingersoll, 829 F.2d. at 306.

### 2.   Is the Civil Authority clause unambiguous?

The policy's "CIVIL AUTHORITY" clause in the Contract of Insurance states that:

> The subject-matter insured is covered against the risk of damage or destruction by civil or military authority for the purposes of preventing further damage or to prevent or mitigate a conflagration, pollution hazard or threat thereof provided that such damage or destruction is not caused or contributed to by war, invasion, revolution, rebellion, insurrection or other hostilities or war like operations or by any risk specifically excluded in this insurance.

Id. at p. 7.

Guardian posits that the plain meaning of this clause only encompasses acts like embargo, confiscation, quarantine, or seizure, or other acts by civil authority directed at the cargo or proximately causing similar loss. (Docket No. 13 at p. 10)  Northwestern Selecta claims that it is plain and unambiguous and that the civil authority clause is applicable because they had to throw away boxes of expired seafood when the

government shut down the island's economy.   (Docket No. 17 at p. 9—10)

### a.   "Damage or Destruction"

We first look to the plain meaning of the words "damage" and "destruction."

The contract does not define either term (Docket No. 13-1)  In the dictionary, the word "damage" means "loss or harm resulting from injury to person, property, or reputation." Merriam-Webster, http://www.merriam-webster.com/dictionary/damage (last visited May 13, 2021).  An "injury" is a "hurt, damage, or loss sustained" or "an act that damages or hurts."   Id. at https://www.merriam-webster.com/dictionary/injury (last visited May 13, 2021).  The plain meaning of damage requires some outside force, *i.e.* an injury that damages or hurts.  If there was no injuring act, then there is no damage.  Plaintiffs do not allege an act that injured their seafood product; they allege that the seafood product became unusable and not consumable when it its shelf-life expired.  (Docket No. 1 at p. 5)  By the plain meaning of 'damage,' the seafood product was not damaged, it merely expired.

"Destruction" meanwhile is "the state or fact of  being destroyed."   Merriam-Webster, http://www.merriam-webster.com/dictionary/destruction (last visited May 13, 2021).

"Destroy" means "to ruin the structure, organic existence, or condition of" or "to put out of existence." Id. at http://www.merriam-webster.com/dictionary/destroy (last visited May 13, 2021).  Thus, to destroy is to ruin the organic existence or condition of a thing, or to put it out of existence.  One could plausibly say that the condition of the goods was ruined when the shelf life expired, because the complaint states that it "bec[a]me unusable, and not consumable."  (Docket No. 1 at p. 5)  Black's law dictionary also defines "destruction" as "**2**.  The quality, state, or condition of being ruined or annihilated; loss" Black's Law Dictionary (1st ed. 2019).  Under this definition, loss and destruction are synonyms.  Id.

In a case with similar facts to this one, Harvest Moon Distributors, LLC v. Southern-Owners Insurance Co., the court analyzed whether there was 'direct physical loss of or damage to' the covered property where a beer distributer alleged that their beer spoiled when their customer, Walt Disney World, closed due to COVID-19 and cancelled its purchase of the beer. 493 F. Supp. 3d 1179 (M.D. Fla. 2020).  The Court found that the spoiled beer was a plausible 'direct physical loss of or damage to' the property for purposes of a motion to dismiss.  Id. at 1184. Because Northwestern Selecta's seafood product was arguably in a ruined state, having become "unusable" after expiring its shelf-

life, Northwestern Selecta has plausibly alleged destruction.
(Docket No. 1 at p. 5); <u>Cf.</u> <u>Harvest Moon</u>, 493 F. Supp. 3d at 1184.

### B.   "By Civil or Military Authority"

Destruction alone does not, however, provide
coverage.   The Civil Authority clause continues that the
destruction must be "**by** civil or military authority." (Docket
No. 13-1 at p. 7) (emphasis added)

Guardian argues that the preposition "by"
requires a showing that the civil authority's acts be directed at
the cargo, or that they at least proximately caused the injury.
(Docket No. 13 at p. 10)   The cases they cite, however, analyze
insurance contracts that contain the words "caused" or "arising
out of," which are not included in this specific provision.[3]  <u>Id.</u>

Northwestern Selecta, on the other hand,
argues that the plain meaning of the clause is broad because it
does not have additional specific policy terms that other policies
do.  (Docket No. 17 at p. 16—17)   It points to cases analyzing

---

[3] <u>Burlington Ins. Co. v. NYC Transit Auth.</u>, 79 N.E.3d 477 (2017) ("We conclude
that where an insurance policy is restricted to liability for any bodily injury
'**caused**, in whole or in part,' by the 'acts or omissions' of the named insured,
the coverage applies to injury proximately caused by the named insured.")
(emphasis added); <u>Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.</u>,
122 F. Supp. 3d 44, 52 (S.D.N.Y. 2015) (construing the phrase '**arising out of**'
as compared to **caused by**); <u>Dale Corp. v. Cumberland Mut. Fire Ins. Co.</u>, No.
CIV.A. 09-1115, 2010 WL 4909600, at *4 (E.D. Pa. Nov. 30, 2010) (" In order to
determine the scope of the policy, I must decide what it means for a bodily
injury to be '**caused, in whole or in part, by**' Nesmith's acts or omissions.")
(emphasis added).

those different policy texts in the context of losses due to Covid-19, and says that since courts denied coverage in those cases because of the specific terms in the policies, the absence of those specific terms here means that this policy **does** create coverage. Id.  Plaintiff argues that as long as the actions taken by the civil authority "directly impacted" the goods, then there is "damage or destruction by civil . . . authority."  Id. at p. 16.

The Court agrees with Guardian that the word "by" requires some civil authority action directed at the insured goods.

The plain meaning of the word "by" is "through the agency or instrumentality of."  Merriam-Webster, http://www.merriam-webster.com/dictionary/by  (last visited May 13, 2021).  "Agency" means "the capacity, condition, or state of acting or of exerting power."  Id. at https://www.merriam-webster.com/dictionary/agency (last visited May 13, 2021).  So, did the civil authority act or exert power to destroy the goods? The plain meaning of these words requires some action directed at the goods themselves, rather than just putting into motion a causal chain that eventually affects them.

If the contract meant a broader causal connection, it could have used the phrase "caused by" as it does in numerous other sections.  See, e.g. Docket No. 13-1 at p. 8

("including loss and/or damage caused by the actions of customs agents").  In contrast, the use of the word "by" alone in the policy is infrequent but illustrative, showing some direct act by the actor or risk listed:  "[d]amage **by** Rodents, Termites, Moths, Vermin and/or any damage **by** pests," Id. at 4 (emphasis added); "loss or damage to the cargo insured **by** sinking, stranding, fire, explosion contact with seawater, or **by** any other cause," Id. at 13 (emphasis added); "any hostile act **by** or against a belligerent power," Id. at 17 (emphasis added); "impact **by** vehicles or aircraft or articles falling therefrom," Id. at 15 (emphasis added).  The plain meaning of "by . . . civil authority" is a direct action of the civil authority on the goods insured.

The lockdown order exempted "businesses related to the food . . . supply chains" (Docket No. 13-2 at p. 3,) as did subsequent executive orders.  Id. at pp. 10, 23, 47, 79—80.  Because the lockdown order was not directed at the goods themselves or their sale by Northwestern Selecta, the destruction of the seafood product was not "by . . . civil authority" within the plain meaning of those words.

The fact that the two events may be part of the same causal chain does not create enough of a nexus between the civil authority's action and Northwestern Selecta's loss when the plain meaning of the policy's text requires that the civil

authority directly affect the insured.  In Southern Hospitality, Inc. v. Zurich American Insurance Co., the Tenth Circuit Court of Appeals interpreted an insurance policy that compensated the insured for loss of business income "caused by action of civil authority that prohibits access to the described premises."  393 F.3d 1137, 1138 (10th Cir. 2004).  In that case, the Federal Aviation Administration (FAA), responding to the terrorist attacks of September 11, 2001, had issued an order prohibiting airplanes from flying.  Id. at 1138.  Due to the grounding of the flights, the plaintiff, a hotel management corporation, lost income when hotel patrons could no longer fly to the hotels.  Id.  The hotels were otherwise open but suffered cancellations because of the travel obstacles to out of town guests.  Id. at 1139—41.

        The plaintiff argued that the FAA's order 'prohibit[ed] access' because its out of town guests were prevented from getting to the properties due to the order.  Id. at 1139.  The court disagreed and, applying Oklahoma law, held that the contract was unambiguous and under the plain meaning of the words "prohibit" and "access," the FAA order prohibited access to **flights**, not hotel operations.  Id. at 1140.  The court explained that the action of the civil authority must target the business, stating that "[c]onsidering the policy as a whole, we agree . . . that the policy was intended to cover losses from an order directly

affecting the hotels, not one tangentially affecting them as here.
. . . [T]he policy requires a direct nexus between the civil
authority order and the suspension of the insured's business.  That
nexus is missing here." Id. at 1141.  Although the action of the
civil authority had the **effect** of decreasing access to the
premises, it was not **directed** at the premises themselves.  Id. at
1140–41.  Consequently, the plaintiffs were not covered for their
loss.  See also Abner, Herrman & Brock, Inc. v. Great Northern
Ins. Co., 308 F. Supp. 2d 331, 336—37 (S.D.N.Y. 2004) (finding
contract unambiguous as the civil authority did not 'prohibit
access' when it allowed employees and customers to approach the
building on foot, even though car traffic to the building was
blocked and that functionally made the conduct of the business
difficult).

        An action by a civil authority that does not
directly affect a business, or its goods does not have enough of
a nexus to create coverage.  See Kean, Miller, Hawthorne, D'Armond,
McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford, No. 06-
770-C, 2007 WL 2489711, at *6 (M.D. La. Aug. 29, 2007) (where the
civil authority merely recommended and encouraged residents remain
off the streets of Baton Rouge as Hurricane Katrina approached,
there did "not appear to be a 'direct nexus' between the civil
authorities' advisories and access to [plaintiff]'s premises");

Syufy Enters. v. Home Ins. Co. of Ind., No. 94-0756, 1995 WL 129229, at *2-3 (N.D.Cal. Mar. 21, 1995) (the civil authority did not specifically prohibit individuals from entering the plaintiff's movie theaters though it imposed a dawn-to-dusk curfew in response to rioting following the Rodney King verdict).  Where the plain meaning of a policy requires some action on the goods, action that merely eventually impacts them is an insufficient nexus.  See Archer-Daniels-Midland Co. v. Phoenix Assur. Co. of New York, 975 F. Supp. 1137, 1142—43 (S.D. Ill. 1997) (analyzing the meaning of 'arrest,' 'restraint,' and 'detain' and finding that the Coast Guard's closing of a river to barge traffic that resulted in plaintiff's grain spoiling on the barge did not fit within the policy because the "closing of the river did not operate 'immediately on any subject'" such that the subject was detained or deemed in the hands of the detainer, nor was any external force applied).

Conversely, where the order of the civil authority is directed at the operation of a specific business, there can be civil authority coverage.  See e.g., Southlanes Bowl, Inc. v. Lumbermen's Mut. Ins. Co., 46 Mich. App. 758 (1973) (loss of business income coverage applied for plaintiffs who operated various places of amusement including bowling alleys, restaurants, and motels that were ordered closed by the Governor of Michigan

following riots in the wake of the assassination of Martin Luther
King, Jr.); Assurance Co. of Am. v. BBB Serv. Co., 265 Ga. App.
35, 35—36 (2003) (affirming a trial court's ruling in favor of the
insured who closed down their Wendy's restaurants pursuant to an
evacuation order prompted by Hurricane Floyd); Altru Health Sys.
v. Am. Prot. Ins. Co., 238 F.3d 961, 963 (8th Cir. 2001) (policy
covered business interruption caused by health authorities closing
the plaintiff's hospital in response to a flood, and the only issue
was whether the coverage was limited by another provision).

        The action of the civil authority at issue in
this case expressly exempted businesses operating in the food
supply chain.  (Docket No. 13-2 at pp. 3, 10, 23, 47, 79—80.)
While the order had the alleged effect of eventually leading to
the seafood product expiring its shelf life, a mere change in
outcome is not enough to trigger coverage.  See Southern
Hospitality, 393 F.3d at 1141 ("the policy was intended to cover
losses from an order directly affecting the hotels, not one
tangentially affecting them as here.").  As in Southern
Hospitality, there needs to be a closer nexus between the damage
or destruction and the civil authority's action.  Id.
"[D]estruction by civil . . . authority" unambiguously requires
that the civil authority's action or power be directed at the

covered goods, not just set in motion a causal chain eventually affecting the product.

>    **3.   Covered as All Risk?**

This leaves the remaining issue of whether plaintiff's loss is covered by the "all risk" provision in the Institute Cargo Clauses (A). (Docket No. 1 at p. 3)

The complete policy is 75-pages long and begins with three "Declaration Pages," (Docket No. 13-1 at p. 1—3) That is followed by an 11-page Contract of Insurance, which begins with a one-page list of "Policy Conditions," referred to as "Original Conditions." Id. at p. 4. It then continues with a 10-page alphabetic list of the terms. Id. at pp. 5-15. The complete terms of the "Original Conditions" ("the Institute Cargo Clauses") follow next and include "Institute Cargo Clauses (A) CL 382," Id. at p. 16—21, and "Institute Frozen/Chilled Food Clauses (A) – 24 Hours Breakdown," among other riders. Id. at pp. 58—64.

Institute Cargo Clauses (A) states that "[t]his insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below." (Docket No. 13-1 at p. 16)

The "EXCLUSIONS" section states that the insurance will not cover "4.4 loss damage or expense caused by inherent vice or nature of the subject-matter insured" or "4.5 loss damage or

expense caused by delay, even though the delay be caused by a risk

insured against." Id.

In the "DURATION" section, Institute Cargo Clauses

(A) states: "Transit Clause . . . 8.8.1 Subject to Clause 11

below, this insurance attaches from the time the subject-matter

insured is first moved . . . for the commencement of transit, . .

. and terminates either:

> 8.1.1 **on completion of unloading** from the carrying
> vehicle or other conveyance in or at the final warehouse
> or place of storage at the destination named in the
> contract of insurance,
>
> 8.1.2 **on completion of unloading** from the carrying
> vehicle or other conveyance in or at any other warehouse
> or place of storage, whether prior to or at the
> destination named in the contract of insurance, which
> the Assured or their employees elect to use either for
> storage other than in the ordinary course of transit or
> for allocation or distribution, or
>
> 8.1.3 **when the Assured** or their employees **elect to use**
> any carrying vehicle or other conveyance or **any**
> **container for storage other than in the ordinary court**
> **of transit** or
>
> 8.1.4 **on the expiry of 60 days after completion of**
> **discharge overside** of the subject-matter insured from
> the oversea vessel at the final port of discharge,
> **whichever shall first occur."**

Id. at 18 (emphasis added).

The "ATTACHMENT AND TERMINATION OF RISK" section in

the Contract of Insurance meanwhile states that the insurance

continues . . . whilst held as stock and/or inventory and until

the Insured's risk and/or interest finally ceases.

Notwithstanding anything herein to the contrary, cover in respect

of stock and/or inventory shall terminate on expiry of this policy,

as per the Period Clause herein.

Id. at p. 5.

The PERIOD section in the Declaration Pages states

the policy is "[o]pen cover to accept risks attaching during the

twelve (12) months period commencing:  From March 1, 2020 To:

March 1, 2021."  Id. at p. 1.

Northwestern Selecta invokes the "all risk"

provision in its Complaint, though argues in its surreply that

this coverage terminated once transit completed, based on the terms

in Clause 8.  (Docket No. 1 at p. 3; Docket No. 23 at p. 3—4)

Guardian argues that no fortuitous event occurred to invoke the

"all risk" coverage.  (Docket No. 13 at p. 6—8)  And Guardian

further argues that the rider's exclusion for loss caused by

inherent vice or delay would still apply because the contract of

insurance extends the coverage to while the cargo is held as stock

or inventory.  (Docket No. 20 at p. 2—3)

Without answering the question of whether the

Institute Cargo Clauses (A) terminated or not, it is clearly

impossible for the exclusions in the policy to have terminated but

not the coverage.  The exclusions in 4.4 and 4.5 are unambiguous:

there is no coverage for loss from cargo that expires its natural
life through the passage of time, even if such "delay" is caused
by a covered peril.  (Docket No. 13-1 at p. 16); see F.C. Bloxom,
2012 WL 13019207 at *5 (explaining that the plaintiff's cargo of
nuts which was stranded in Venezuela were lost "as a result of
delay" "because the passage of time rendered them valueless.").

      The proximate cause of the loss is not examined
when a clause like 4.5 unambiguously states that there is no
coverage for "loss damage or expense caused by delay, even though
the delay be caused by a risk insured against."  See Archer-
Daniels-Midland Co. v. Phoenix Assur. Co. of New York, 975 F. Supp.
1137, 1147 (S.D. Ill. 1997) ("[T]he Delay Clause in the Policy at
issue clearly states that losses arising from delay are
excluded *whether caused by a peril insured against or otherwise*
. . . .  To hold otherwise would give the Delay Clause no meaning
and would render it a nullity.") (emphasis in original).

      If coverage were available through the "all risk"
clause of the Institute Cargo Clauses (A), the loss to plaintiff
is unambiguously barred by exclusions 4.4. and 4.5.  (Docket
No. 13-1 at p. 16)

## IV.  Conclusion

    For the reasons set forth above, the Court **GRANTS** defendant
Guardian's motion to dismiss the complaint.  (Docket No. 13)

Because no other relief would be appropriate, the complaint is **DISMISSED with prejudice.**   (Docket No. 1)   Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 24, 2021.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
